IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

BONNIE MINCEY, STEPHANIE )
O'ROURKE, and TINA SINGER, )
individually and on behalf of all others )
similarly situated, )
)                    C.A. No. 2:07-cv-03762-PMD
          Plaintiffs, )
)
v. )
)                    **ORDER**
)
WORLD SAVINGS BANK, FSB; )
GOLDEN WEST FINANCIAL )
CORPORATION; and WACHOVIA )
CORPORATION, )
)
)
          Defendants. )
_____)

This matter is before the court upon three motions: (1) a Motion to Dismiss filed by

Defendants Golden West Financial Corporation ("Golden West") and Wachovia Corporation

("Wachovia"); (2) a Motion for Judgment on the Pleadings filed by Defendant World Savings Bank,

FSB ("WSB" or "World"); and (3) a Cross-Motion for Judgment on the Pleadings filed by Plaintiffs

Bonnie Mincey, Stephanie O'Rourke, and Tina Singer ("Plaintiffs").  For the reasons set forth

herein, the court grants the Motion to Dismiss filed by Golden West and Wachovia.  The court

grants in part and denies in part WSB's Motion for Judgment on the Pleadings and also grants in part

and denies in part Plaintiffs' Motion for Judgment on the Pleadings.[1]

## BACKGROUND

Plaintiffs filed the instant lawsuit on November 16, 2007 as a class action, though as of this

---

[1]Plaintiffs have only moved for Judgment on the Pleadings with respect to their claims
pursuant to the Truth in Lending Act.

date, a class has not been certified, and an Amended Complaint was filed on January 18, 2008.  The

Amended Complaint states that such action is brought

> based on Defendants' failure to clearly and conspicuously disclose to Plaintiffs and
> the Class Members, in Defendants' Option Adjustable Rate Mortgage ("Option
> ARM") loan documents and in the required disclosure statements accompanying the
> loans, (i) the actual interest rate on which the payment amounts listed in the Truth
> in Lending Disclosure Statements are based (12 C.F.R. § 226.17); (ii) that making
> the payments according to the payment schedule in the Truth in Lending Disclosure
> Statement provided by Defendants will result in negative amortization and that the
> principal balance will increase (12 C.F.R. § 226.19); and (iii) that the payment
> amounts listed on the Truth in Lending Disclosure Statement are insufficient to pay
> both principal and interest.

(Am. Compl. ¶ 1.)  The Amended Complaint explains that an Option ARM "is a monthly adjustable

rate mortgage that gives the borrower multiple monthly payment options.  When the borrower

receives his or her monthly statement, it provides options to pay a minimum payment amount, an

interest only payment, a payment based on a 30-year amortization, or a 15-year amortization."  (*Id.*

¶ 20.)  The Amended Complaint also states,

> Up to 80 percent of all Option ARM borrowers make only the minimum payment
> each month, often because they are not properly informed about the terms of the
> loan.  The unpaid interest is then added to the balance of the mortgage, a process
> called "negative amortization."  Once the balance reaches a set amount, usually 125
> percent of the original loan principal, the loan is automatically reset to a higher rate.

(*Id.* ¶ 23.)

Plaintiffs assert the Defendants "engaged in a campaign of deceptive conduct and

concealment aimed at maximizing the number of consumers who would accept this type of loan in

order to maximize Defendants' profits, even as Defendants knew their conduct could cause long-

term difficulties for consumers and could result in the loss of their homes through foreclosure."  (*Id.*

¶ 29.)  According to Plaintiffs, Defendants "failed to disclose, and by omission, failed to inform

Plaintiffs of the fact that Defendants' Option ARM loan was designed to, and did, cause negative

amortization to occur." (*Id.* ¶ 30.)  Plaintiffs further allege that "the payment schedule provided by Defendants was *guaranteed* to be insufficient to pay all of the interest due, let alone both principal and interest, which was certain to result in negative amortization." (*Id.* ¶ 34.)  These interest charges above and beyond the fixed payment "were added to the principal balance on [Plaintiffs'] home loans in ever-increasing increments, substantially increasing the principal balance on their home loans and reducing the equity in these borrowers' homes." (*Id.* ¶ 38.)  The Amended Complaint also states,

> The Option ARM loans sold by Defendants all have the following uniform characteristics:
>> (a) The loan has a low fixed payment amount for the first 10 years of the Note, as evidenced in the payment schedule provided by Defendants;
>> (b) The payment amount is wholly unrelated to the interest rate listed on the Note and Truth in Lending Disclosure Statement;
>> (c) The Note states that each payment will go to both principal and interest;
>> (d) The payment amounts listed in the Truth in Lending Disclosure Statement are not sufficient to pay the actual interest being charged, and none of the payments up through the first 10 years of the Note are applied to the principal balance;
>> (e) The low payment amount listed in the Note and Truth in Lending Disclosure Statement was intended by Defendants to mislead consumers into believing that the low payments for the first 10 years of the loan were based on the listed interest rate;
>> (f) The chief marketing gimmick, minimum payment, was intended to misleadingly portray to consumers that the low payments would continue for years with no negative amortization;
>> (g) The payment has a capped annual increase on the payment amount;
>> (h) If the unpaid balance on the loan exceeds a certain percentage of the original principal borrowed (usually 125 percent), the payment automatically reset[s] at a higher interest rate and/or payment amount; and
>> (i) The loan includes a prepayment penalty for a period up to three (3) years, thereby preventing consumers from refinancing during that time.

(*Id*. ¶ 45.)  Plaintiffs list the following causes of action in their Amended Complaint: (1) violation

of the Truth in Lending Act ("TILA") and the corresponding regulations; (2) "fraudulent omissions;"

(3) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"); and (4) breach of

contract and the implied covenant of good faith and fair dealing.  (*See* Am. Compl.)  As noted above,

several motions are pending in the instant case, and the court will address each one in turn.

## ANALYSIS

### A.    Motion to Dismiss Filed by Golden West and Wachovia

Golden West and Wachovia filed a Motion to Dismiss pursuant to Rules 9(b) and 12(b)(6)

of the Federal Rules of Civil Procedure on February 21, 2008.  (*See* Doc. No. [23].)  This motion

asserts Plaintiffs "have inappropriately sued two entities [(Golden West and Wachovia)] with which

they have no relationship whatsoever."  (Mem. in Supp. of Mot. to Dismiss at 1.)  These Defendants

state,

> Plaintiffs do not allege that they had any contact with either Wachovia or Golden
> West, nor do the loan documents attached to their Complaint support any such
> allegations.  Plaintiffs' Complaint alleges essentially nothing against Wachovia or
> Golden West.  Instead, Plaintiffs improperly lump Wachovia and Golden West with
> World but make no specific, substantive allegations against Wachovia or Golden
> West.

(*Id*. at 1-2.)  Golden West and Wachovia assert the documents attached to the Complaint[2]

demonstrate that Plaintiffs' only relationship was with WSB and that "Plaintiffs' conclusory

allegations of 'agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment,

alter-ego, partnership, or employment,' without any factual support, are insufficient" under *Bell*

*Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  (*Id*. at 2.)  Golden West and Wachovia further

---

[2]Presumably Golden West and Wachovia are referring to Plaintiffs' Amended Complaint.

state,

> [T]he loan documents attached to [Plaintiffs'] Complaint clearly disclose that Golden West and Wachovia are not "creditors" under the TILA, thereby mandating dismissal of those claims. . . Plaintiffs have failed to plead fraud with sufficient particularity. Finally, because Plaintiffs have no relationship with Golden West or Wachovia, whether contractual or otherwise, they cannot assert claims for unfair trade practices, breach of contract, and breach of the implied covenant of good faith and fair dealing against them.

(Mem. in Supp. of Mot. to Dismiss at 3.)

Plaintiffs filed a Response in Opposition on April 4, 2008, asserting they "have properly pleaded that World Savings Bank acted as the agent of Golden West and Wachovia in making the loan, and that Defendants were acting in concert with each other or were joint participants and collaborators in the acts complained of in Plaintiffs' First Amended Class Action Complaint." (Resp. in Opp'n to Mot. to Dismiss at 1.)  Plaintiffs further assert "there is ample evidence that these Defendants are properly named parties and had direct involvement in Plaintiffs' and Class Members' loans."  (*Id*.)

1.     **Standard of Review for Motion to Dismiss Pursuant to Rule 12(b)(6)**

Upon reading all the documents in the record associated with the Motion to Dismiss, it is clear the parties have differing views on the standard this court should employ in evaluating a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Golden West and Wachovia cite *Twombly* for the proposition that "'[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level . . . .'" (Mem. in Supp. of Mot. to Dismiss

at 3-4 (quoting *Twombly*, 127 S. Ct. at 1965).)  Plaintiffs, however, assert the standard of review is as follows:

> "A Rule 12(b)(6) motion should be granted only if, after accepting all well-pleaded allegations in the complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claims that entitles him to relief." *Mattress v. Taylor*, 487 F. Supp. 2d 665, 667-68 (D.S.C. 2007); *see also, Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Wood v. Moseley Architects, P.C.*, No. 4:07-147-RBH, 2007 WL 2428630, at *1 (D.S.C. Aug. 21, 2007) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Id.* (quoting *Republican Party of N.C.*, 980 F.2d at 952).  "Further, '[u]nder the liberal rules of federal pleading, a complaint should survive a motion to dismiss if it sets out facts sufficient for the court to *infer* that all the required elements of the cause of action are present.'" *Mattress*, 487 F. Supp. 2d at 668 (quoting *Wolman v. Tose*, 467 F.2d 29, 33 n.5 (4th Cir. 1972)).  The court "must assume that the allegations of the complaint are true and construe them in the light most favorable to the plaintiff." *Republican Party of N.C.*, 980 F.2d at 952.

(Resp. in Opp'n to Mot. to Dismiss at 2.)  Plaintiffs then assert Defendants' heavy reliance on *Twombly* is misplaced, as it is based on the mistaken assumption that *Twombly* "has re-instated the intricate fact-based pleading requirements of the nineteenth century."  (*Id.* at 3.)

In order to resolve the disagreement, two Supreme Court opinions merit discussion: *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955 (2007), and *Erickson v. Pardus*, 127 S. Ct. 2197 (2007).  The question in *Twombly* was whether an action pursuant to § 1 of the Sherman Act "can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action."  *Twombly*, 127 S. Ct. at 1961.  The district court dismissed the complaint for failure to state a claim, understanding that allegations of

parallel conduct, taken alone, do not state a claim under § 1.  *Id*. at 1963.  The district court concluded the plaintiffs "must allege additional facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *Id*. (internal quotation marks omitted). The United States Court of Appeals for the Second Circuit reversed, holding the district court tested the complaint by the wrong standard.  *Id*.  The Second Circuit held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." *Id*. (internal quotation marks omitted).  The Supreme Court granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct.  *Id*.

The Court began its analysis by stating that the "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Id*. at 1964 (internal quotation marks omitted).  In other words, while a showing of parallel business behavior "'is admissible circumstantial evidence from which the fact finder may infer agreement,' it falls short of 'conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense.'" *Id*. (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540-41 (1954)).  In a frequently quoted passage, the Supreme Court stated,

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid*.; *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  Factual allegations must be enough to raise a right to relief above the speculative level, *see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) . . . ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of]

a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Twombly*, 127 S. Ct. at 1964-65.

Applying those standards, the Court held "that stating such a claim [pursuant to § 1 of the Sherman Act] requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  *Id*. at 1965.  The Court continued,

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief."  A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without the further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.  An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief."  *Cf. DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation–for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint.").

*Id*. at 1966.

The plaintiffs in *Twombly* argued against the plausibility standard, asserting such a standard is in conflict with a statement in *Conley v. Gibson*, 355 U.S. 41 (1957), construing Rule 8.  *See Twombly*, 127 S. Ct. at 1968.  In *Conley v. Gibson*, the Court noted "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley*, 355 U.S. at 45-46.  The Court in *Twombly* indicated this language "can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings."  *Twombly*, 127 S. Ct. at 1968.  The Court stated the "no set of facts" language "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."  *Twombly*, 127 S. Ct. at 1969 (citations omitted).

Ultimately, the Court agreed with the district court's determination that the plaintiffs' claim should be dismissed.  *Id*. at 1970.  "Although in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations."  *Id*.  The Court stated, "Here . . . we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.  Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Id*. at 1974.

Plaintiffs rely heavily on *Erickson*, which was issued shortly after *Twombly*.  *See Erickson*, 127 S. Ct. 2197.  In that case, the United States Court of Appeals for the Tenth Circuit affirmed the district court's dismissal of the plaintiff's § 1983 complaint, and the Court granted review because the "holding departs in [a] stark . . . manner from the pleading standard mandated by the Federal Rules of Civil Procedure."  *Erickson*, 127 S. Ct. at 2198.  The plaintiff therein alleged that he had been removed from treatment for hepatitis C, an action that endangered his life and continued to

damage his liver.  *Id*. at 2199.  The Court of Appeals concluded the plaintiff had made only

conclusory allegations that he had suffered a cognizable independent harm as a result of removal

from the treatment program.  *Id*.  The Court determined this conclusion was erroneous and stated,

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement
> of the claim showing that the pleader is entitled to relief."  Specific facts are not
> necessary; the statement need only "'give the defendant fair notice of what the . . .
> claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550
> U.S.—, —, 127 S. Ct. 1955, 167 L. Ed. 2d 929, — (2007) (slip op., at 7-8) (quoting
> *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  In addition, when ruling on a defendant's
> motion to dismiss, a judge must accept as true all of the factual allegations contained
> in the complaint.

*Erickson*, 127 S. Ct. at 2200 (some citations omitted).  The Court thus vacated the judgment of the

Court of Appeals and remanded the case for further proceedings.  *Id*.

Returning to the case *sub judice*, the court determines Plaintiffs advocate a standard of

review that is contrary to law.  Plaintiffs have cited the "no set of facts" language, despite the fact

that the Supreme Court characterized it as "an incomplete, negative gloss on an accepted pleading

standard." *Twombly*, 127 S. Ct. at 1969.[3]  Furthermore, Plaintiffs seem to be saying that because

they have complied with Rule 8 of the Federal Rules of Civil Procedure, the court should not grant

the Motion to Dismiss filed pursuant to Rule 12(b)(6).  (*See* Resp. in Opp'n to Mot. to Dismiss at

5.)  The problem with this argument, however, is that it simply does not follow; assuming Plaintiffs'

Amended Complaint complies with Rule 8 does not automatically indicate the Amended Complaint

states a claim upon which relief can be granted.

---

[3]Plaintiffs have cited to this court's order in *Mattress v. Taylor*, 487 F. Supp. 2d 665,
667-68 (D.S.C. 2007) (Duffy, J.), to support their position.  This court decided *Mattress* on
January 3, 2007, well before the Supreme Court issued its opinion in *Twombly* on May 21, 2007.
In *Mattress*, this court cited *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999),
which in turn cited *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).
*Republican Party* cites the "no set of facts" language from *Conley*.

Many courts have acknowledged that *Twombly* altered the standard of review for a Motion to Dismiss under Rule 12(b)(6), even if that alteration was slight.  *See Morales-Tañon v. Puerto Rico Elec. Power Auth.*, 524 F.3d 15, 18 (1st Cir. 2008) (stating that to survive a Rule 12(b)(6) motion, a complaint must contain factual allegations sufficient to raise a right to relief above the speculative level and noting that *Twombly* "retire[d] the seemingly broader language regarding pleading standards" in *Conley*); *Mellon Investor Servs., LLC v. Longwood Country Garden Ctrs., Inc.*, 263 Fed. App'x 277, 281 (4th Cir. 2008) ("We must dismiss a complaint if it does not allege enough facts to state a claim to relief that is plausible on its face."); *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32, 234 (3d Cir. 2008) (noting two new concepts in *Twombly*: (1) the Court uses language that it has not used before, and (2) the Court disavowed the "no set of facts" language from *Conley*; also stating that Rule 8(a)(2) "has it right" in requiring "not merely a short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief'"); *Williams v. United States*, 257 Fed. App'x 648, 649 (4th Cir. 2007) ("To survive a Rule 12(b)(6) motion, factual allegations must be enough to raise a right to relief above the speculative level and have enough facts to state a claim to relief that is plausible on its face." (internal quotation marks omitted)); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) ("We may affirm dismissal [pursuant to Rule 12(b)(6)] only if the complaint fails to set forth enough facts to state a claim to relief that is plausible on its face." (internal quotation marks omitted)); *TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1236 (10th Cir. 2007) ("In *Bell Atlantic*, the Supreme Court articulated a new 'plausibility' standard under which a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'"); *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 n.2 (10th Cir. 2007) ("Although the Supreme Court was not clear on the articulation of the

proper standard for a Rule 12(b)(6) dismissal, its opinion in *Bell Atlantic* and subsequent opinion

in *Erickson* . . . suggest that courts should look to the specific allegations in the complaint to

determine whether they plausibly support a legal claim for relief.").[4]

The court concludes that *Twombly* did slightly alter the standard of review for a Motion to

Dismiss pursuant to Rule 12(b)(6).  The court will use the following method in evaluating the

motion filed by Wachovia and Golden West:  When considering a Rule 12(b)(6) motion, a court

must accept as true the facts alleged in the complaint and view them in a light most favorable to the

plaintiff.  *See Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
> detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his
> "entitlement to relief" requires more than labels and conclusions, and a formulaic
> recitation of the elements of a cause of action will not do.  Factual allegations must
> be enough to raise a right to relief above the speculative level, on the assumption that
> all the allegations in the complaint are true (even if doubtful in fact).

*Twombly*, 127 S. Ct. at 1964-65 (citations omitted).

### 2.    Analysis

#### a.    Insufficient Factual Allegations

Golden West and Wachovia argue that "Plaintiffs' bald allegations of 'agency,' 'alter ego,'

'conspiracy,' and 'joint venture' cannot save their deficient claims."  (Mem. in Supp. of Mot. to

Dismiss at 4.)  These Defendants first assert that Plaintiffs have alleged no facts supporting an alter

ego or veil-piercing theory.  (*Id.* at 5.)  Defendants state, "The only allegations supporting Plaintiffs'

---

[4]In *Anderson v. Sara Lee Corp.*, 508 F.3d 181 (4th Cir. 2007), the Fourth Circuit noted
that the Court in *Twombly* used a plausibility standard and retired the "no set of facts" language
from *Conley*.  *Anderson*, 508 F.3d at 188 n.7.  However, the Fourth Circuit stated, "In the wake
of *Twombly*, courts and commentators have been grappling with the decision's meaning and
reach.  In disposing of this appeal, there is no need for us to delve into or resolve any such
issues."  *Id.*

alter ego or veil-piercing theory are that World is a wholly-owned subsidiary of Golden West, Golden West is a wholly-owned subsidiary of Wachovia, and, thus, these companies are 'alter-egos.'" (*Id*. at 6.)   Defendants next assert that Plaintiffs have alleged no facts supporting a conspiracy theory because (1) a corporation cannot conspire with its parents or subsidiaries; (2) the Amended Complaint "is devoid of any allegation that World, Golden West and/or Wachovia <u>agreed to injure Plaintiffs</u>"; and (3) the Amended Complaint "contains no specific allegation of special damages." (*Id*. at 7-8.)   Defendants further argue that Plaintiffs' Amended Complaint contains no factual allegations supporting their claim of a joint venture. (*Id*. at 10.)

Golden West and Wachovia next argue Plaintiffs' Amended Complaint fails to state a claim against them pursuant to the TILA because it "fails to allege that Golden West and Wachovia are 'creditors'–which is a necessary element of their TILA claims." (*Id*. at 11.)   These Defendants further assert the Amended Complaint fails to state a claim for fraud against them, stating that while the Amended Complaint "asserts a myriad of allegations against all Defendants, [it] does not contain sufficient specificity for Golden West and Wachovia to ascertain the allegations against them individually." (*Id*. at 13.)   These Defendants continue, "Moreover, because the loan documents attached to Plaintiffs' [Amended] Complaint prove that they have no relationship whatsoever with Golden West or Wachovia, there are, in fact, no circumstances under which they could plead fraud with the particularity required by Rule 9(b)." (*Id*. at 15.)   Lastly, Golden West and Wachovia assert Plaintiffs' claims for violation of the SCUTPA, breach of contract, and breach of the implied covenant of good faith and fair dealing cannot survive because "Plaintiffs have no relationship whatsoever with Golden West or Wachovia." (*Id*.)

In their Response in Opposition, Plaintiffs assert they "have alleged a relationship between

the Defendants by way of agency and have put them on notice as to the nature of Plaintiffs' claims,"

citing paragraphs 1, 6-11, 14, 42, and 43 of the Amended Complaint for support.  (Resp. in Opp'n

to Mot. to Dismiss at 5.)  Plaintiffs state,

> [A]ccording to an announcement made by Wachovia in May 2006 and information contained on their respective websites, Wachovia, Golden West, and World Savings Bank, FSB have "merged" under Wachovia and all World Savings' accounts have been transferred to Wachovia.  See Exh. 1.  Furthermore, the "Pick-a-Payment" Option ARM loan that is the subject of this litigation is a registered service mark of Golden West, and the "Pick-a-Payment Premium" loan is a registered service mark of Wachovia.  See Exh. 2.  This may explain why World used Wachovia and Golden West's indexes to calculate the interest rates on Plaintiffs' loans.  (Defendants' Memorandum in Support of Motion to Dismiss, p. 2.)
>
> Plaintiffs were also provided with documents at the time of their closing that stated, "I am aware that Wachovia Bank, National Association and its affiliates offer additional products and services that may meet my financial needs.  I authorize Wachovia Bank, National Association to use the information contained in my application. . . ."  See Exh. 3.  Plaintiffs were also provided with affiliated business arrangement disclosures which state, "I have read this disclosure form and understand that *Wachovia Bank, National Association* is referring me to obtain the above described settlement service from World Savings Bank, FSB and that *Wachovia Bank, National Association may receive a financial or other benefit as a result of this referral*, and "this referral may provide Wachovia Bank, National Association a financial or other benefit."  See Exh. 3.

(*Id*. at 5-6.)

Rule 12 of the Federal Rules of Civil Procedure provides that "[i]f, on a motion under Rule

12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the

motion must be treated as one for summary judgment under Rule 56.  All parties must be given a

reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P.

12(d); *see also Wilson-Cook Med., Inc. v. Wilson*, 942 F.2d 247, 252 (4th Cir. 1991) ("Had the

district court accepted and *considered* the affidavits relevant to the 12(b)(6) motion, the motion to

dismiss for failure to state a claim would have been converted to a motion for summary judgment.").

Defendants Golden West and Wachovia did not submit any materials in support of their Motion to

14

Dismiss.  Plaintiffs, however, did submit such materials in their Response in Opposition.

The court will begin its analysis with the allegations in the Amended Complaint.  In paragraph 1 of the Amended Complaint, Plaintiffs allege all Defendants failed

> to clearly and conspicuously disclose to Plaintiffs and the Class Members, in Defendants' Option Adjustable Rate Mortgage ("Option ARM") loan documents and in the required disclosure statements accompanying the loans, (i) the actual interest rate on which the payment amounts listed in the Truth in Lending Disclosure Statements are based (12 C.F.R. § 226.17); (ii) that making the payments according to the payment schedule in the Truth in Lending Disclosure Statement provided by Defendants will result in negative amortization and that the principal balance will increase (12 C.F.R. § 226.19); and (iii) that the payment amounts listed on the Truth in Lending Disclosure Statement are insufficient to pay both principal and interest.

(Am. Compl. ¶ 1.)  Plaintiffs allege WSB, Golden West, and Wachovia are in the business of "promoting, marketing, distributing and selling" Option ARM loans, and Golden West is the parent corporation of WSB.  (*Id.* ¶¶ 6-7, 9.)  The Amended Complaint also alleges that Wachovia is the parent corporation of Golden West.  (*Id.* ¶ 8.)  Furthermore, Plaintiffs allege

> 10.  Plaintiffs are informed and believe that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.
> 11.  Plaintiffs are informed and believe that at all times material hereto and alleged herein each of the Defendants sued herein acted through and was the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.
> . . .
> 14.  Plaintiffs are informed and believe that at all times alleged herein, Defendants, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

(*Id.* ¶¶ 10-11, 14.)

Golden West and Wachovia cannot be held liable for World's actions simply because Golden West is World's parent, and Wachovia is Golden West's parent. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 349 (4th Cir. 1998) (stating, in applying North Carolina law, "A corporate parent cannot be held liable for the acts of its subsidiary unless the corporate structure is a sham and the subsidiary is nothing but a mere instrumentality of the parent." (internal quotation marks omitted)); *Carroll v. Smith-Henry, Inc.*, 281 S.C. 104, 106, 313 S.E.2d 649, 651 (Ct. App. 1984) ("Stock ownership alone ordinarily does not render a parent corporation liable for the contracts of its subsidiary irrespective of whether the subsidiary is wholly owned or only partially owned. . . .").  It is clear from Plaintiffs' Amended Complaint that they recognize as much because they allege "each of the Defendants sued herein acted through and was the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant." (Am. Compl. ¶ 11.)  Such an allegation is a kitchen-sink approach to the task of attempting to hold Golden West and Wachovia liable for actions of WSB. *Cf. Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 & n.2 (10th Cir. 1993) (noting there are at least four possible theories under which a parent company may be held liable for the discriminatory acts of its subsidiaries–the integrated enterprise theory, the agency theory, the alter ego theory, and the

instrumentality theory).  Furthermore, vague and conclusory allegations do not suffice.  *See DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."); *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979) ("Dismissal was proper as to the applicants-plaintiffs and the employee-plaintiff Mitchell.  Their conclusory allegations of discrimination were not supported by any references to particular acts, practices, or policies of the Fire Department.  They failed to state a claim under Rule 8(a)(2)."); *cf. Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").

The court concludes the allegations as stated in Plaintiffs' Amended Complaint do not withstand the Motion to Dismiss filed by Golden West and Wachovia.  As noted above, Plaintiffs have alleged Golden West and Wachovia are liable on numerous differing theories, but there are no factual allegations in the Amended Complaint to support these theories.  Although Rule 8 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (internal quotation marks omitted).  Plaintiffs' Amended Complaint alleges very little against Golden West and Wachovia, other than their corporate relationship to WSB, and the remaining allegations simply state legal conclusions without any factual allegations.  More is required to survive the Motion to Dismiss.  *See Jackam v. Hospital Corp. of America Mideast, Ltd.*, 800 F.2d 1577, 1580-81 (11th Cir. 1986) (concluding the district

17

court erred in dismissing the action for failure to state a claim because the plaintiffs alleged, *inter alia*, "HCAME, as a subsidiary of HCA, is an agent of HCA which executes personnel and labor relations policy established by the parent corporation" and that "HCA exercised dominion and control over Appellee HCAME, and as the parent corporation, controlled the activities and decisions of its subsidiary HCAME"); *Gill v. Byers Chevrolet LLC*, No. 2:05-cv-00982, 2007 WL 3025328, at *6 (S.D. Ohio Oct. 15, 2007) (denying the defendant's motion to dismiss because the court concluded the pleadings contained sufficient factual allegations but stating that "if Gill is seeking to pierce the corporate veil in order to hold Byers Holding liable, then he must allege facts in his Second Amended Complaint that, at the very least, implicate the *Belvedere* factors")[5]; *Thompson v. Quorum Health Res., LLC*, No. 1:06-cv-168-R, 2007 WL 2815972, at *2 (W.D. Ky. Sept. 27, 2007) (granting Triad's motion to dismiss, stating, "There is nothing in the complaint that would lead the Court to regard Quorum as the alter ego of Triad.  The complaint contains no allegations that Quorum is a mere instrumentality of Triad.  There are no allegations of any misuse of the corporate form.  If Triad and Quorum are separate legal entities, Plaintiff must allege *facts* in the complaint that would allow the Court to find that a legal entity that is separate from Plaintiff's employer can still be considered Plaintiff's employer under the F[alse Claims Act]." (emphasis added)); *In re Alstom SA Securities Litigation*, 454 F. Supp. 2d 187, 215-16 (S.D.N.Y. 2006)

---

[5]In *Belvedere Condominium Unit Owners' Association v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1086 (Ohio 1993), the Supreme Court of Ohio stated,

> [T]he corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

(concluding the plaintiffs' allegations were sufficient under Rule 8 to plead a veil-piercing claim because they "alleged facts supporting their claim of control and dominance of ATI by Alstom and Alstom USA, including the disregard of corporate formalities . . . in suspending . . . [two employees], Alstom USA's one hundred percent stock ownership of ATI and Alstom's one hundred percent stock ownership of Alstom USA, that ATI and Alstom USA had shared offices, and that Alstom and Alstom USA used this control and dominance of ATI to carry out the ATI fraud"); *Maung Ng We v. Merrill Lynch & Co.*, No. 99 Civ. 9687(CSH), 2000 WL 1159835, at *5 (S.D.N.Y. Aug. 15, 2000) ("[P]laintiff's conclusory statements that MLIB and Teoh and Elias were 'agents' of MLC, MLG and/or MLIFC do not allege an agency relationship sufficient to withstand dismissal . . . . Plaintiffs must do more than state the legal conclusion that MLIB was the defendants' agent[;] it must plead facts that support a finding that such agency existed."); *Richard v. Bell Atlantic Corp.*, 946 F. Supp. 54, 60 (D.D.C. 1996) (finding an allegation that BAC "operates through" its subsidiaries insufficient to hold BAC liable for the alleged discrimination of its subsidiaries).

In their Response in Opposition, Plaintiffs have presented evidence that (1) Wachovia, Golden West, and World have "merged" and that all of World's accounts have been transferred to Wachovia; (2) the "Pick-a-Payment" Option ARM loan is a registered service mark of Golden West; (3) the "Pick-a-Payment Premium" loan is a registered service mark of Wachovia; and (4) a disclosure statement provided to Plaintiffs indicated that Wachovia Bank, National Association is referring them to obtain the described service from World and that Wachovia Bank, National Association may receive a financial benefit as a result of this referral.  (*See* Resp. in Opp'n to Mot. to Dismiss at 5-6.)

Golden West and Wachovia argue in Reply that "Plaintiffs cannot correct their pleading

deficiencies by making new factual assertions in their Response." (Reply at 6.) These Defendants also assert that even if the court considers these new arguments, the arguments "do not save their deficient claims." (*Id*. at 7.) Defendants state that in order to assert a veil-piercing or alter ego claim, Plaintiffs must allege the parent exerted undue control over the subsidiary or otherwise circumvented corporate formalities, but the new allegations "do not come even remotely close to alleging the requisite undue control or failure to observe corporate formalities." (*Id*.) Defendants also argue these new allegations do not save the claim for conspiracy pursuant to South Carolina law, nor do they "save their claim of joint venture," as the new allegations "do not allege that either Golden West, Wachovia, or World had any right to control the others." (*Id*. at 7-8.)

"A memorandum in opposition or response . . . cannot remedy the defects in a party's complaint." *Booker v. Washington Mut. Bank, F.A.*, 375 F. Supp. 2d 439, 441 (M.D.N.C. 2005). Instead, "[t]he remedy for an insufficient complaint is amendment under Rule 15 of the Federal Rules of Civil Procedure . . ." *Id*. at 441-42. In a footnote in the Response in Opposition, Plaintiffs state, "To the extent that this Court finds that Plaintiffs have not sufficiently pled the facts in their Complaint, Plaintiffs respectfully request this Court permit them to amend their Complaint to comply with this Court's findings." (Resp. in Opp'n to Mot. to Dismiss at 7 n.2.) From this single statement, it is unclear how Plaintiffs wish to amend their complaint. The court therefore concludes that if Plaintiffs wish to amend, they should file the appropriate motions. *See McNamara v. Pre-Paid Legal Servs., Inc.*, 189 Fed. App'x 702, 718 (10th Cir. 2006); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699-700 (6th Cir. 2004); *see also Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000).

### b.   Violation of TILA against Golden West and Wachovia

Golden West and Wachovia assert they are entitled to dismissal with respect to Plaintiff's TILA claim because "Plaintiffs' [Amended] Complaint fails to allege that . . . [they] are 'creditors' . . ." (Mem. in Supp. of Mot. to Dismiss at 11.) Plaintiffs' Response in Opposition does not address this argument. (*See* Resp. in Opp'n.)

Plaintiffs' Amended Complaint does not allege that Golden West or Wachovia are creditors. The Amended Complaint does allege that "[t]he Option ARM loan Defendants sold to Plaintiffs violates the Truth in Lending Act." (Am. Compl. ¶ 31.) There are three attachments to the Amended Complaint, and the first attachment concerns Plaintiff Mincey's loan. It indicates that the "Lender is WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK, its successors and/or assignees, or anyone to whom this Note is transferred." (Am. Compl. Ex. 1.) Furthermore, the Truth in Lending Disclosure statement is titled "World Savings Federal Truth in Lending Disclosure Required by Regulation Z." (*Id*.) The documents concerning Plaintiff O'Rourke and Plaintiff Singer are identical. (*See* Am. Compl. Exs. 2 and 3.)

The TILA requires creditors to disclose certain information about the terms of the loan to the prospective borrower. *See, e.g.,* 15 U.S.C. §§ 1631-1632; 15 U.S.C. § 1638; 12 C.F.R. § 226.17. "Only 'creditors' are liable under TILA and Reg[ulation] Z." *Moore v. Flagstar Bank*, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (citing 15 U.S.C. § 1635(a); 15 U.S.C. § 1640(a); 12 C.F.R. § 226.17(a)(1)); *see also Redic v. Gary H. Watts Realty Co.*, 762 F.2d 1181, 1185 (4th Cir. 1985) ("Only 'creditors' are subject to the [Truth in Lending] Act's civil penalties." (citing 15 U.S.C. § 1640(a))); *Lukas v. Lucci Ltd., Inc.*, 966 F. Supp. 1163 (S.D. Fla. 1997) (granting the defendant's motion for summary judgment because he did not fit the definition of a "creditor" under the TILA).

The TILA specifically defines the term "creditor":

> The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f).  Regulation Z contains a similar provision:

> Creditor means: (i) A person (A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

12 C.F.R. § 226.2(a)(17).

In the case *sub judice*, there is no allegation that Plaintiffs' obligation is initially payable to Golden West or Wachovia.  Furthermore, the documents attached to the Amended Complaint as exhibits indicate the obligation is initially payable to WSB.  The definition of the term "creditor" requires both prongs to be met, and the allegations in the Amended Complaint along with the attachments indicate that neither Golden West nor Wachovia qualifies as a "creditor" under the TILA.  *See Moore*, 6 F. Supp. 2d at 503 ("Since the debt is not payable to Crossstate, it was not a creditor subject to liability under TILA and Reg Z at the time of closing."); *see also Piche v. Clark County Collection Serv., LLC*, 119 Fed. App'x 104, 106 (9th Cir. 2004) (concluding the defendant was not subject to the TILA because it does not satisfy either condition in the definition of "creditor").  The court therefore grants the Motion to Dismiss filed by Golden West and Wachovia with respect to the TILA claim.

### c.      Fraud

Golden West and Wachovia assert Plaintiffs' Amended Complaint fails to state a cause of action against them for fraud because while it "asserts a myriad of allegations against all Defendants," it "does not contain sufficient specificity for Golden West and Wachovia to ascertain the allegations against them individually."  (Mem. in Supp. of Mot. to Dismiss at 13.)

Rule 9(b) of the Federal Rules of Civil Procedure states in part, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  In interpreting this rule, several courts "have held that a plaintiff alleging fraud must make particular allegations of the time, place, speaker, and contents of the allegedly false acts or statements."  *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 249-50 (D. Md. 2000) (citing *Windsor Assocs., Inc. v. Greenfield*, 564 F. Supp. 273, 280 (D. Md. 1983)).  A complaint failing to specifically allege the time, place, and nature of the fraud is subject to dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 980 (4th Cir. 1990).  However, "a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied: '(1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Adams*, 193 F.R.D. at 250 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

In the case *sub judice*, Plaintiffs do not appear to be asserting fraud on the basis of affirmative misrepresentations; Plaintiffs' second cause of action instead alleges that Defendants had

a duty to disclose certain information and that they failed to do so.  (*See* Am. Compl. ¶¶ 108-121.)[6]

As indicated by the United States District Court for the Middle District of North Carolina,

"fraudulent concealment, or fraud by omission, . . . 'is by its very nature, difficult to plead with

particularity.'" *Breeden v. Richmond Cmty. College*, 171 F.R.D. 189, 195 (M.D.N.C. 1997) (quoting

*Daher v. G.D. Searle & Co.*, 695 F. Supp. 436, 440 (D. Minn. 1988)).

Plaintiffs have lumped all Defendants together in a manner that is impermissible for purposes

of Rule 9(b).  *See Vicom Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994);

*Zaremski v. Keystone Title Assocs., Inc.*, 884 F.2d 1391, at *2 (4th Cir. 1989) (unpublished table

decision) ("Thus, 'where multiple defendants are asked to respond to allegations of fraud, the

complaint should inform each defendant of the nature of his alleged participation in the fraud.'"

(quoting *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987)); *Adams*, 193

F.R.D. at 250; *Goldstein v. Malcom G. Fries & Assocs., Inc.*, 72 F. Supp. 2d 620, 627 (E.D. Va.

1999) ("A plaintiff may not group all wrongdoers together in a single set of allegations.").   It

appears, however, from a fair reading of the Amended Complaint, that Plaintiffs are simply seeking

to hold Golden West and Wachovia liable because of their relationship with WSB.  The real problem

with Plaintiffs' Amended Complaint is that it is simply unclear on what basis Plaintiffs seek to hold

Golden West and Wachovia liable.  As the court in *Adams* stated,

> Where a plaintiff is seeking to hold a defendant vicariously liable for the acts of its
> agents, it must allege the factual predicate for the agency relationship with
> particularity.  *Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557, 568-69 (S.D.N.Y.

---

[6]As indicated, it does not *appear* that Plaintiffs seek to recover from affirmative
misrepresentations, but the Amended Complaint does state, "The aforementioned omitted
information was not known to Plaintiffs which, at all times relevant, Defendants failed to
disclose and/or actively concealed by making such statements and partial, misleading
representations to Plaintiffs and all others similarly situated."  (Am. Compl. ¶ 113.)

> 1996).  When an agency relationship is allegedly part of the fraud, the circumstances constituting fraud on the part of the purported principal, which must be pled with particularity under Rule 9(b), include both the facts constituting the underlying fraud and the facts establishing the agency relationship.  *Id.* at 569.

*Adams*, 193 F.R.D. at 250.  The court therefore grants the Motion to Dismiss with respect to Plaintiffs' fraud claim.

### d.    Claims for Violation of the SCUTPA, Breach of Contract, and Breach of the Implied Covenant of Good Faith and Fair Dealing

Golden West and Wachovia argue Plaintiffs' claims for violation of the SCUTPA, breach of contract, and breach of the implied covenant of good faith and fair dealing fail because "Plaintiffs have no relationship whatsoever with Golden West or Wachovia."  (Mem. in Supp. of Mot. to Dismiss at 15.)  Again, the documents attached to the Amended Complaint reveal that WSB was the lender; Plaintiffs seek to hold Golden West and Wachovia liable for WSB's actions through a variety of different theories, such as agency and joint venture, without alleging any facts to support those theories.

Defendants first assert the SCUTPA claim should be dismissed because the documents attached to the Amended Complaint reveal that Plaintiffs did not engage in any transactions with Golden West or Wachovia.  (*Id.* at 16.)  Defendants cite *South Carolina Department of Mental Health v. Hoover Universal, Inc.*, C.A. No. 3:03-4118, at 8 (D.S.C. Oct. 4, 2005), for support.  In that case, Judge Joseph Anderson stated,

> SCUTPA remedies are limited to purchasers who engaged in a consumer transaction with the defendant. . . [P]laintiffs must have purchased the product directly from the defendant in order to recover under SCUTPA.  Plaintiffs assert that privity is not required by the SCUTPA, though they do not cite to any authority for this proposition and do not otherwise distinguish *Reynolds* [*v. Ryland Group, Inc.*, 340 S.C. 331, 531 S.E.2d 917 (2000)].

While Defendants seemingly characterize this area of law as settled, Judge Norton has interpreted

*Reynolds* to impose a privity requirement for SCUTPA claims only in the home builder/buyer

context.  *See Colleton Preparatory Academy, Inc. v. Hoover Universal, Inc.*, 412 F. Supp. 2d 560,

565 (D.S.C. 2006).  In fact, he certified the following question to the South Carolina Supreme Court:

> Can a plaintiff who used but did not purchase a product directly from the defendant
> and nonetheless suffered a loss as a result of the defendant's unfair or deceptive acts
> obtain relief under the South Carolina Unfair Trade Practices Act?

(Order on Motion to Reconsider [84] at 11 in *Colleton Preparatory Academy*.)

The court need not tarry on this issue.  It is clear from the documents attached to the

Amended Complaint that Plaintiffs' relationship was with WSB, not Golden West or Wachovia.

Plaintiffs cannot hold Golden West or Wachovia liable under the SCUTPA simply because they are

related to WSB.  Plaintiffs are seeking to hold Golden West and Wachovia liable on a number of

theories–such as agency and joint venture–but as noted above, there are simply no factual allegations

in the Amended Complaint to support these theories.  For this reason, the court concludes the

SCUTPA claim fails.

Golden West and Wachovia next argue Plaintiffs' breach of contract action fails.

"'Generally, one not in privity of contract with another cannot maintain an action against him in

breach of contract . . . .'"  *Windsor Green Owners Ass'n, Inc. v. Allied Signal, Inc.*, 362 S.C. 12, 17,

605 S.E.2d 750, 752 (Ct. App. 2004) (quoting *Bob Hammond Constr. Co. v. Banks Constr. Co.*, 312

S.C. 422, 424, 440 S.E.2d 890, 891 (Ct. App. 1994)); *see also Battle v. Seibels Bruce Ins. Co.*, 288

F.3d 596, 603 (4th Cir. 2002) (affirming grant of summary judgment to Seibels Bruce with respect

to all of plaintiff's claims against it, including breach of contract, based on the lack of privity

between the plaintiff and Seibels Bruce).  Moreover, this is not a case involving a third-party

beneficiary because Plaintiffs were in fact parties to the contract at issue–the contract at issue simply

did not have Defendants Golden West and Wachovia as parties to the agreement.  Plaintiffs do not

have a breach of contract claim against Golden West or Wachovia.

Lastly, Golden West and Wachovia argue they are entitled to dismissal with respect to the

claim for breach of the implied covenant of good faith and fair dealing.  (Mem. in Supp. of Mot. to

Dismiss at 16.)  Defendants assert that because Plaintiffs' only contractual relationship was with

WSB, this cause of action must be dismissed.  (*Id*. at 16-17.)  The court agrees with Golden West

and Wachovia.  In *RoTec Services, Inc. v. Encompass Services, Inc.*, 359 S.C. 467, 473, 597 S.E.2d

881, 884 (Ct. App. 2004), the Court of Appeals of South Carolina "conclude[d] that the implied

covenant of good faith and fair dealing is not an independent cause of action separate from the claim

for breach of contract."  Because Plaintiffs do not have a cause of action against Golden West or

Wachovia for breach of contract, they likewise cannot state a claim against these Defendants for

breach of the implied covenant of good faith and fair dealing.

**B.      Cross-Motions for Judgment on the Pleadings**

As noted above, Plaintiffs brought suit against WSB for (1) violation of the Truth in Lending

Act ("TILA") and the corresponding regulations; (2) "fraudulent omissions;" (3) violation of the

South Carolina Unfair Trade Practices Act ("SCUTPA"); and (4) breach of contract and the implied

covenant of good faith and fair dealing.   The parties filed Cross-Motions for Judgment on the

Pleadings.  Before turning to the parties' arguments, the court will review of some of the terms of

the loans as well as the disclosures given to Plaintiffs.

**1.      Standard of Review for Motion for Judgment on the Pleadings**

Rule 12(c) of the Federal Rules of Civil Procedure states, "After the pleadings are closed–but

early enough not to delay trial–a party may move for judgment on the pleadings."  In evaluating a

Motion for Judgment on the Pleadings, the district court uses the same standard it uses when evaluating a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  In ruling on the Motion to Dismiss, the court may consider the pleadings as well as any documents attached to the pleadings. *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *see also* Fed. R. of Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

### 2.      Terms of the Loans and Disclosures

Plaintiff Bonnie Mincey obtained her loan from WSB on May 25, 2007, and it carried an initial interest rate of 7.170%.  (Def.'s Mot. for J. Ex. 1 at 1.)[7]  The note explained that the interest rate Mincey "will pay may change on the 15th day of July, 2007 and on the same day every month thereafter," but the "lifetime maximum interest rate limit is 11.950%, called the 'Lifetime Rate Cap.'"  (*Id*.)  The note further states, "Beginning with the first Interest Change Date, my interest rate will be based on an index," the "'Cost of Savings Index' as published by Wachovia Corporation." (*Id*. at 2.)  WSB, the Lender, calculates the "new interest rate by adding 2.250 percentage points, called the 'Margin,' to the Current Index." (*Id*.)  Section Three of the note contains many provisions relevant to this suit; it states, in part,

> **3.  PAYMENTS**
> **(A) Time and Place of Payments**
> I will pay Principal and interest by making payments every month.
> . . .
> **(B) Amount of My Initial Monthly Payments**

---

[7]All exhibits referred to in this Order are attached to the pleadings.

Each of my initial monthly payments will be in the amount of U.S. **$455.12**. This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

. . .

**(D) Calculation of Payment Changes**

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, together with interest at the interest rate in effect on the day of calculation by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap" . . .

**(E) Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G) Payment Cap Limitation; Exceptions**

Beginning with the 10th Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

(*Id*. at 2-3.)

The Truth in Lending Disclosure Statement given to Plaintiff Mincey indicates the annual

percentage rate for her loan is 7.230%, and it also indicates the finance charge is $268,840.75; the

amount financed is $140,016.00; and the total payments are $408,856.75.  (Def.'s Mot. for J. Ex.

4.)   The disclosure statement states, "THIS LOAN CONTAINS AN ADJUSTABLE RATE

FEATURE.   SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT

PREVIOUSLY GIVEN TO YOU."  (*Id.*)  Furthermore, it contains the following table indicating

Mincey's payment schedule:

| **Number of Payments** | **Amount of Payments** | **When Payments Are Due:** **MONTHLY beginning on** |
|---|---|---|
| 12 | $455.12 | 07/15/07 |
| 12 | 489.25 | 07/15/08 |
| 12 | 525.94 | 07/15/09 |
| 12 | 565.39 | 07/15/10 |
| 12 | 607.79 | 07/15/11 |
| 12 | 653.37 | 07/15/12 |
| 12 | 702.37 | 07/15/13 |
| 12 | 755.05 | 07/15/14 |
| 3 | 811.68 | 07/15/15 |
| 260 | 1,338.59 | 10/15/15 |
| 1 | 1,336.95 | 06/15/37 |

(*Id.*)

Plaintiff O'Rourke's loan closed on June 29, 2006, and the note indicated the initial

interest rate was 7.060%.  (Def.'s Mot. for J. Ex. 2 at 1.)  This note indicated the interest rate

changes biweekly but that the rate can never be higher than 11.950%.  (*Id.* at 1-2.)  The biweekly

adjustments to the interest rate are based on an index, specifically the "weighted average of the

interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries . . . of Golden West Financial Corporation . . .” (*Id*. at 2.)  The note also states that the initial amount of O'Rourke's biweekly payments is $229.28 and that this payment was selected by O'Rourke "from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance."  (*Id*.)  The remainder of the terms are substantially similar to the terms of Mincey's loan, and the note contains a similar Section 3(E):

> **(E) Deferred Interest; Additions to My Unpaid Principal**
> From time to time, my biweekly payments may be insufficient to pay the total amount of biweekly interest that is due.  If this occurs, the amount of interest that is not paid each payment, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

(*Id*. at 3.)

The Truth in Lending Disclosure Statement given to Plaintiff O'Rourke indicates the annual percentage rate for her loan is 7.317%, and it also indicates the finance charge is $169,081.42; the amount financed is $118,661.50; and the total payments are $287,742.92. (Def.'s Mot. for J. Ex. 5.)  The disclosure statement states, "THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE.  SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU."  (*Id*.)  Furthermore, it contains the following table indicating O'Rourke's payment schedule:

| **Number of Payments** | **Amount of Payments** | **When Payments Are Due: BIWEEKLY beginning on** |
|---|---|---|
| 26 | $229.28 | 08/07/06 |
| 26 | 246.48 | 08/06/07 |
| 26 | 264.97 | 08/04/08 |

| 26 | 284.84 | 08/03/09 |
| 26 | 306.20 | 08/02/10 |
| 26 | 329.17 | 08/01/11 |
| 26 | 353.86 | 07/30/12 |
| 26 | 380.40 | 07/29/13 |
| 26 | 408.93 | 07/28/14 |
| 26 | 439.60 | 07/27/15 |
| 354 | 572.98 | 07/25/16 |
| 1 | 571.02 | 02/18/30 |

(*Id.*)

Plaintiff Singer's loan closed on November 29, 2005, and the note indicated the initial interest rate was 6.420%.  (Def.'s Mot. for J. Ex. 3 at 1.)  This note indicated the interest rate changes biweekly but that the rate can never be higher than 11.950%.  (*Id.* at 1-2.)  The biweekly adjustments to the interest rate are based on an index, specifically the "weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries . . . of Golden West Financial Corporation . . ." (*Id.* at 2.)  The note also states that the initial amount of Singer's biweekly payments is $470.83 and that this payment was selected by Singer "from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance."  (*Id.*)  The remainder of the terms are substantially similar to the terms of both Mincey's and O'Rourke's loan, and the note also states:

**(E) Deferred Interest; Additions to My Unpaid Principal**
From time to time, my biweekly payments may be insufficient to pay the total

amount of biweekly interest that is due.  If this occurs, the amount of interest that is not paid each payment, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

(*Id*. at 3.)

The Truth in Lending Disclosure Statement given to Plaintiff Singer indicates the annual percentage rate for her loan is 6.513%, and it also indicates the finance charge is $290,340.35; the amount financed is $244,659.46; and the total payments are $534,999.81.  (Def.'s Mot. for J. Ex. 6.)  The disclosure statement states, "THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE.  SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU."  (*Id*.)  Furthermore, it contains the following table indicating Singer's payment schedule:

| **Number of Payments** | **Amount of Payments** | **When Payments Are Due: BIWEEKLY beginning on** |
|---|---|---|
| 26 | $470.83 | 01/09/06 |
| 26 | 506.14 | 01/08/07 |
| 26 | 544.10 | 01/07/08 |
| 26 | 584.91 | 01/05/09 |
| 26 | 628.78 | 01/04/10 |
| 26 | 675.94 | 01/03/11 |
| 26 | 726.64 | 01/02/12 |
| 26 | 781.14 | 12/31/12 |
| 26 | 839.73 | 12/30/13 |
| 26 | 902.71 | 12/29/14 |
| 367 | 983.20 | 12/28/15 |
| 1 | 981.49 | 01/21/30 |

(*Id*.)

33

3.        **Analysis**

a.        **The TILA Claim**

In its Motion for Judgment on the Pleadings, WSB asserts Plaintiffs fail to allege a

violation of the TILA.  (Def.'s Mem. in Supp. of Mot. for J. at 14.)  WSB states,

> All of Plaintiffs' theories of liability in their First Cause of Action under
> the TILA rest on their argument that a lender violates the TILA when it makes an
> "Option ARM" or Pick-a-Payment Loan that offers the borrower the ability to
> make periodic payments that are insufficient to cover the accrued interest and the
> lender does not (1) provide the borrower with a payment schedule showing the
> payments needed to avoid negative amortization; and (2) include an affirmative
> representation on the final TILA disclosure statement that negative amortization
> "will" occur if the borrower makes only the minimum payments.  These
> arguments are wrong.  The TILA Disclosure Statements attached to Plaintiffs'
> Complaint establish that World fully complied with its obligations under the
> TILA.  Thus, World's Motion should be granted.

(*Id.*)  WSB argues the court should grant its Motion for Judgment on the Pleadings because: (1)

O'Rourke and Singer's claims for actual and statutory damages are time-barred, and Plaintiffs

cannot seek rescission for allegedly deficient "negative amortization" disclosures; (2) WSB's

payment schedules complied with the TILA; and (3) WSB's "negative amortization" disclosures

fully complied with the TILA.  (*See id.* at 18-28.)

Plaintiffs, on the other hand, argue the court should grant their Motion for Judgment on

the Pleadings because the pleadings reveal that Defendants have failed to comply with the TILA.

(*See* Pl.'s Mem. in Supp. of Mot. for J. at 12.)  Plaintiffs state that the note and program

disclosures provided to them "contradict the payment schedule as set forth on the" Truth in

Lending Act Disclosure Statement "and are misleading."  (*Id.*)  According to Plaintiffs, the

disclosure statement "fails to disclose that negative amortization will occur under the payment

schedule as set forth."  (*Id.*)  Plaintiffs point out that although the note indicates that Plaintiffs

"will pay the Principal and interest by making payments" every month or every two weeks, the payment schedule disclosed in the Truth in Lending disclosure statement "does not reflect any payment of principal for approximately the first ten years." (*Id*. at 14.)  Plaintiffs next assert that "Defendants' failure to disclose the other payment options is a violation of the letter and spirit of the TILA." (*Id*.)  Although there were four different payment options, Plaintiffs assert "Defendants failed to disclose the different payment options available and their effects anywhere" in the disclosure statement, the note, or the program disclosure form provided to Plaintiffs at the time of their closings.  (*Id*. at 15.)  Lastly, Plaintiffs assert the Defendants "failed to disclose the actual interest rate on which the payments set forth in the schedule" on the TILA disclosure statement are based.  (*Id*. at 16.)

WSB first argues O'Rourke's and Singer's claims for actual and statutory damages are time-barred and that Plaintiffs cannot seek rescission for the allegedly deficient "negative amortization" disclosures.  (Def.'s Mem. in Supp. of Mot. for J. at 18.)  Plaintiffs have not responded to this argument.

Title 15, United States Code, Section 1640(e) provides a statute of limitations; it states in part, "Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."  *See also Tucker v. Beneficial Mortgage Co.*, 437 F. Supp. 2d 584, 589 (E.D. Va. 2006) ("15 U.S.C. § 1640(e) establishes a one (1) year statute of limitations period applying to claims for civil damages arising from TILA violations, which begins running from the date of the complained of violation.  If the violation is one of disclosure in a closed-ended credit transaction, the date of the occurrence of the violation is no later than the date the plaintiff enters

the loan agreement." (internal quotation marks omitted)); *Davis v. Edgemere Fin. Co.*, 523 F.

Supp. 1121 (D. Md. 1981); *cf. Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703 (11th Cir.

1998) (evaluating whether equitable tolling applies to the one-year statute of limitations in 15

U.S.C. § 1640(e)).

O'Rourke's loan closed on June 29, 2006, and Singer's loan closed on November 29,

2005.  The instant lawsuit was filed on November 16, 2007, and O'Rourke and Singer became

Plaintiffs in this action on January 18, 2008.  Regardless of whether the court uses the November

16, 2007, or the January 18, 2008, date, the one-year statute of limitations has run.

WSB then argues that none of the Plaintiffs can rescind their loans for the allegedly

defective "negative amortization" disclosures because "allegedly defective 'negative

amortization' disclosures do not extend the period in which a borrower may rescind her

transaction."  (Def.'s Mem. in Supp. of Mot. for J. at 18.)  Title 12, Code of Federal Regulations,

§ 226.23 states in part,

> The consumer may exercise the right to rescind until midnight of the third
> business day following consummation, delivery of the notice required by
> paragraph (b) of this section, or delivery of all material disclosures, whichever
> occurs last.  If the required notice or material disclosures are not delivered, the
> right to rescind shall expire 3 years after consummation, upon transfer of all of the
> consumer's interest in the property, or upon sale of the property, whichever
> occurs first. . . .

12 C.F.R. § 226.23(a)(3); *see also* 15 U.S.C. § 1635; *Travis v. Prime Lending*, No. 3:07cv00065,

2008 WL 2397330, at *2 (W.D. Va. June 12, 2008).  In a footnote, the regulations state that the

term "'material disclosure' means the required disclosures of the annual percentage rate, the

finance charge, the amount financed, the total payments, the payment schedule, and the

disclosures and limitations referred to in § 226.32(c) and (d)."  12 C.F.R. § 226.23 n.48; *see also*

*Hager v. American Gen. Fin., Inc.*, 37 F. Supp. 2d 778, 785 (S.D.W. Va. 1999). Furthermore, the Official Staff Commentary states,

> Material disclosures.  Footnote 48 sets forth the material disclosures that must be provided before the rescission period can begin to run.  Failure to provide information regarding the annual percentage rate also includes failure to inform the consumer of the existence of a variable rate feature.  Failure to give the other required disclosures does not prevent the running of the rescission period, although that failure may result in civil liability or administrative sanctions.

12 C.F.R. Pt. 226, Supp. I, § 226.23(a)(3).

It does not appear that any of the Plaintiffs exercised the right to rescind within the three-day period, and Plaintiffs do not allege WSB failed to notify them of their right to rescind.  The court must thus determine whether WSB failed to deliver a "material disclosure."  The Truth in Lending Disclosure Statements at issue in the case *sub judice* all list the annual percentage rate, the finance charge, the amount financed, the total of payments, and the payment schedule, and the statements note the existence of a variable rate.  Because the disclosure statements include these disclosures, the court concludes WSB made all "material disclosures."  *See*  12 C.F.R. § 226.23 n.48; *see also Hager*, 37 F. Supp. 2d at 785 (noting that if a lender fails to disclose the annual percentage rate, the finance charge, the amount financed, the total payments, or the payment schedule, the right to rescind is extended from three days to three years); *Moore v. Flagstar Bank*, 6 F. Supp. 2d 496, 504 (E.D. Va. 1997) ("Material disclosures are the annual percentage rate, the finance charge, the amount financed, the total of payments, and the payment schedule.  Thus, failure to provide any of these material disclosures to a consumer may result in rescission of the transaction and civil liability on behalf of the creditor."); *Mills v. Home Equity Group, Inc.*, 871 F. Supp. 1482, 1485 (D.D.C. 1994) ("Five specific disclosures are considered to be 'material disclosures': 1) the amount financed; 2) the finance charge; 3) the annual percentage

rate; 4) the payment schedule; and 5) the total of payments.  If these material disclosures are not made, then the consumer retains for three years the right to rescind the transaction." (internal citation omitted)).  Because WSB made the material disclosures, Plaintiffs cannot now seek rescission of their loans.

Although there are several points of contention about the TILA's disclosure requirements, the main one is whether it is a violation of the TILA to disclose that negative amortization *may* occur when in fact it *will* occur if Plaintiffs make the payments as indicated in the payment schedule listed on the TILA disclosure statement.  Congress enacted the TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. § 1601(a).  The TILA requires lenders to make certain prominent disclosures when extending credit, including the amount financed, the finance charge, and the annual percentage rate.  *See* 15 U.S.C. § 1638; *see also* 12 C.F.R. §§ 226.17 and 226.18.  The required disclosures must be made "clearly and conspicuously in writing."  12 C.F.R. § 226.17(a)(1).

Title 12, section 226.19 of the Code of Federal Regulations states in part,

(b) Certain variable-rate transactions.  If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier:
(1) The booklet titled Consumer Handbook on Adjustable Rate Mortgages published by the Board and the Federal Home Loan Bank Board, or a suitable substitute.
(2) A loan program disclosure for each variable-rate program in which the consumer expresses an interest.  The following disclosures, as applicable, shall be provided:
        (i) The fact that the interest rate, payment, or term of the loan can

38

> change.
> (ii) The index or formula used in making adjustments, and a source
> of information about the index or formula.
> . . .
> (vii) Any rules relating to changes in the index, interest rate,
> payment amount, and outstanding loan balance including, for
> example, an explanation of interest rate or payment limitations,
> negative amortization, and interest rate carryover. . . .

12 C.F.R. § 226.19(b).  The Official Staff Commentary concerning 12 C.F.R. § 226.19(b)(2)(vii)

states in part,

> Negative amortization and interest rate carryover.  A creditor must disclose,
> where applicable, the possibility of negative amortization.  For example, the
> disclosure might state, "If any of your payments is not sufficient to cover the
> interest due, the difference will be added to your loan amount."  Loans that
> provide for more than one way to trigger negative amortization are separate
> variable-rate programs requiring separate disclosures.  (See the commentary to §
> 226.19(b)(2) for a discussion on the definition of a variable-rate loan program and
> the format for disclosure.)  If a consumer is given the option to cap monthly
> payments that may result in negative amortization, the creditor must fully disclose
> the rules relating to the option, including the effects of exercising the option (such
> as negative amortization *will* occur and the principal loan balance will increase);
> however, the disclosure in § 226.19(b)(2)(viii) need not be provided.

12 C.F.R. Pt. 226, Supp. I, § 226.19(b)(2)(vii) (emphasis added).

WSB argues that its disclosures complied with the TILA because "[t]he language used by

World in its Loan Program Disclosures is virtually identical to the language contained in the

Commentary."  (Def.'s Resp. in Opp'n to Mot. for J. at 4.)  WSB also states that "contrary to

Plaintiffs' allegations, the Loan Program Disclosures make it clear that, if the payments are

insufficient to cover accrued interest, World **will add** the unpaid interest to the principal balance,

thus resulting in 'negative amortization.'" (*Id*.)

In *Andrews v. Chevy Chase Bank, FSB*, 240 F.R.D. 612 (E.D. Wis. 2007), the plaintiffs

brought a putative class action against the defendants, alleging *inter alia* that the defendant "did

not sufficiently disclose the consequences of negative amortization." *Andrews*, 240 F.R.D. at

620.  The disclosure at issue in that case stated,

> Interest Rate changes and your ability to make less than a Fully Amortizing
> Payment each month, or a combination of the two, may result in the accumulation
> of accrued but unpaid interest ('Deferred Interest Balance').
>
> Each month that the payment option you choose is less than the entire interest
> portion, we will add the Deferred Interest Balance to your unpaid principal.  We
> will also add interest on the Deferred Interest Balance to your unpaid principal
> each month.  The interest rate on the Deferred Interest Balance will be the Fully
> Indexed Rate.

*Id*.  The court found this disclosure satisfied the requirements of the TILA, stating, "Although

[the] defendant did not use the language suggested by the commentary, it did inform borrowers

as to what would occur if they made only the minimum monthly payments.  Thus, defendant's

disclosure satisfied TILA."  *Id*.  In this case, however, it appears that at least initially a portion of

the minimum monthly payment of $701.21 went to pay down the principal of the loan.  *Id*. at

615.  However, "[a]s the interest rate increased, an ever increasing portion of the minimum

monthly payment . . . was needed to cover interest, and the minimum payment itself soon

became insufficient to cover accrued interest."  *Id*.  Thus, while WSB relies heavily on this case,

the case is distinguishable from the case *sub judice*, as in *Andrews* negative amortization was

simply a mere possibility.

Two recent orders of the United States District Court for the Northern District of

California counsel in favor of denying WSB's Motion to Dismiss.  *See Plascencia v. Lending 1st

Mortgage*, No. C 07-4485 CW, 2008 WL 1902698 (N.D. Cal. Apr. 28, 2008); *Mandrigues v.

World Savs., Inc.*, No. C 07-04497 JF, 2008 WL 1701948 (N.D. Cal. Apr. 9, 2008).  In

*Mandrigues*, the court denied the defendants' motion to dismiss.  *Mandrigues*, 2008 WL

1701948, at *2.  The disclosure at issue in *Mandrigues* was very similar to the disclosure in the case *sub judice*; it stated,

> From time to time my monthly payments may be insufficient to pay the total amount of the monthly interest that is due.  If this occurs, the amount of interest that is not paid each month, called deferred interest, will be added to my principal and will incur interest at the same rate as the principal.

*Id*.  The plaintiffs argued this disclosure was "false and misleading because in reality the loans were designed to *guarantee* that negative amortization would occur," and plaintiffs asserted the defendants failed to disclose the effect the payment cap would have on the loan.  *Id*.  The court noted,

> Defendants argue that because the TILDS identify the creditor, the amount financed and the APR, they meet the disclosure requirements of TILA.  Plaintiffs respond that under the terms of the promissory notes, when the increase in the interest rate exceeded the increase in the payment amounts that were kept at or below the payment cap, the deficiency alleged resulted in further negative amortization being added to the principal.  Plaintiffs claim that Defendants completely failed to disclose the *effect* that the payment cap would have on the loans.  The Court concludes that at least at the pleading stage, Plaintiffs adequately have alleged a claim under 12 C.F.R. § 226.17 and 12 C.F.R. § 226.19.

*Id*.

Likewise, the plaintiffs in *Plascencia* brought suit against the defendants for violations of the TILA.  *Plascencia*, 2008 WL 1902698.  The plaintiffs claimed the defendants violated the TILA by failing to clearly and conspicuously disclose, *inter alia*, the fact that negative amortization was certain to occur.  *Id*. at *2.  The defendants moved to dismiss plaintiffs' claim "based primarily on the Note and the Statement, which they claim defeat any contention that TILA's disclosure requirements were not satisfied."  *Id*. at *3.  The court denied the defendants' motion to dismiss the plaintiffs' claim that defendants violated the TILA by failing to disclose

that negative amortization was certain to occur.  *See id.* at *5-6.  The court examined 12 C.F.R. §

226.19(b)(2)(vii) and the Official Staff Commentary.  *See id.* at *5.  The plaintiffs asserted the

defendants violated this section by "failing to disclose that, if [p]laintiffs followed the payment

schedule listed in the Statement, negative amortization was certain to occur."  *Id.* at *6.  The

court noted the disclosure referred to negative amortization as a possibility; the disclosure stated

in part,

> Because my monthly payment amount changes less frequently than the interest
> rate, and because the monthly payment is subject to the 7.5% Payment Cap
> described in Section 5(B), my monthly payment *could be less than or greater
> than the amount of interest owed each month*.  For each month that my monthly
> payment is less than the interest owed, the Note Holder will subtract the amount
> of my monthly payment from the amount of the interest portion and will add the
> difference to my unpaid Principal.

*Id.*

> In evaluating the motion to dismiss, the court stated,

> > While these statements are literally accurate, they refer to negative
> > amortization as a mere possibility.  Yet under any conceivable Index value, it was
> > clear at the time the disclosures were provided that Plaintiffs' initial minimum
> > monthly payment would not be sufficient to cover interest.  Thus, negative
> > amortization was a certainty if [p]laintiffs followed the payment schedule listed in
> > the Statement.
> > Plaintiffs may be able to show that the Note's reference to negative
> > amortization as a hypothetical event does not clearly and conspicuously disclose
> > "the effects of exercising the [payment cap] option"–i.e., that "negative
> > amortization *will* occur and the principal loan balance *will* increase."  12 C.F.R.
> > Pt. 226, Supp. I, at ¶ 19(b)(2)(vii)(2) (emphasis added).  Accordingly, this claim
> > will not be dismissed.

*Id.*

The court finds the reasoning of the United States District Court for the Northern District

of California to be persuasive.  WSB does not deny that following the payment schedule listed in

the Truth in Lending Disclosure Statement will result in negative amortization; instead it states,

> Plaintiffs ignore that their payment schedules very clearly contemplate negative amortization by showing payment increases in excess of 7 ½ percent prior to the tenth payment change date. . . . [T]he TILA simply does not require a statement as advocated by Plaintiffs.  Instead, a lender is required only to disclose the <u>possibility</u> of negative amortization.

(Def.'s Mem. in Supp. of Mot. for J. at 22-23.)  The problem with WSB's argument is that it is arguing the TILA allows it to disclose something that is false: that negative amortization is merely a possibility when in fact it is a certainty.  The court concludes that disclosing the possibility of negative amortization is misleading when the reality is that it will occur.  The court therefore denies WSB's Motion for Judgment on the Pleadings and grants Plaintiffs' Motion for Judgment on the Pleadings with respect to the claim that WSB violated the TILA by disclosing negative amortization was a possibility when in fact it was a certainty.

Plaintiffs next argue that WSB violated the TILA because the payment schedule as set forth on the disclosure statement contradicted the note.  (Pls.' Mem. in Supp. of Mot. for J. at 13.)  Plaintiffs point to the following statement in the notes: "I will pay Principal and interest by making payments every month" or "I will pay Principal and interest by making payments every two weeks."  (*See* Def.'s Mot. for J. Exs. 1-3.)  Despite this statement, Plaintiffs assert the payment schedule in the disclosure statements "do[] not reflect any payment of principal for approximately the first ten years."  (Pl.'s Mem. in Supp. of Mot. for J. at 14.)  WSB argues that Plaintiffs are wrong, stating that if it had provided a payment schedule of a payment amount sufficient to pay both principal and interest so as to avoid negative amortization, such a schedule "would have violated the TILA and Regulation Z because it would not have been based on the parties' legal obligations at the time of consummation."  (Def.'s Mem. in Supp. of Mot. for J. at 23.)

43

Title 12, Code of Federal Regulations, section 226.17(c)(1) states that disclosures "shall reflect the terms of the legal obligation between the parties."  The Official Commentary indicates the disclosures "shall reflect the credit terms to which the parties are legally bound *as of the outset of the transaction*."  12 C.F.R. Pt. 226, Supp. I, § 226.17(c)(1) (emphasis added).  The commentary further states,

> 8.  Basis of disclosures in variable-rate transactions.  The disclosures for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation.  Creditors should base disclosures only on the initial rate and should not assume that this rate will increase.  For example, in a loan with an initial rate of 10 percent and a 5 percentage points rate cap, creditors should base the disclosures on the initial rate and should not assume that this rate will increase 5 percentage points.

*Id*.

The problem with Plaintiffs' argument is that had Defendants made the disclosure Plaintiffs advocate, it would not have reflected the legal obligation of Plaintiffs.  In arguing for a TILA violation for failure to disclose that negative amortization was certain to occur, Plaintiffs argue such fact should have been disclosed as a certainty rather than a possibility because negative amortization was a certainty.  Now Plaintiffs argue the disclosure statement should have listed a payment schedule showing individual monthly payments that would fully amortize principal and interest.  The terms of the legal obligation did in fact call for negative amortization to occur, so any disclosure to the contrary would have been erroneous.  The court therefore grants WSB's Motion for Judgment on the Pleadings on this ground.[8]

---

[8]In a footnote, WSB states that "Plaintiffs' argument that the payment schedules 'do not reflect any payment of principal for approximately the first ten years' disproves their claim that World did not adequately disclose negative amortization."  (Def.'s Resp. in Opp'n at 7 n.5.)  The court finds the violation, however, in the misleading nature of the disclosures as opposed to any technical misstatement.  Over and over again, WSB indicated negative amortization was a

Plaintiffs third argument is that WSB's failure to disclose the other payment options is a violation of the letter and spirit of the TILA.  (Pls.' Mem. in Supp. of Mot. for J. at 14.) Plaintiffs state,

> Here, the borrowers are legally obligated to pay one of several amounts at the time they make a payment[;] however, they have the option as to which they will pay.  These options include the minimum payment (which is the assumed payment in the schedule disclosed on the TILDS), an interest-only payment, a payment of interest and principal that would fully amortize the loan over thirty years at the then-current interest rate, and a similar payment that would amortize over 15 years.
>
> Defendants failed to disclose the different payment options available and their effects anywhere in the TILDS, the Note, or the Program Disclosure Form that were provided to Plaintiffs at the time of their closings.  Indeed, the only payment option that Plaintiffs were shown was the option that resulted in the most risk to the consumer, and the most pecuniary benefit to the Defendants. ("Your payment schedule will be.") By failing to provide Plaintiffs with the different payment options and their effects, Defendants failed to comply with TILA.

(Pls.' Mem. in Supp. of Mot. for J. at 15.)

The only authority Plaintiffs have cited in support of this argument is *Town & Country Co-op v. Lang*, 286 N.W.2d 482, 486 (N.D. 1979), and Plaintiffs cited it for the proposition that "[t]he congressional purpose of enacting the TILA was to require creditors to disclose the true cost of consumer credit, so that consumers could make informed choices among available methods of payment."  WSB did make the proper disclosures (with the exception concerning the certainty of negative amortization) concerning the loan agreement signed by Plaintiffs.  WSB is not required to make disclosures above and beyond those required by the TILA.  *See Cosby v. Mellon Bank, N.A.*, 407 F. Supp. 233, 234 (W.D. Pa. 1976) ("[T]he requirements of disclosure under the [Truth in Lending] Act do not apply to all information that a creditor might furnish to a

---

*possibility* when in fact it was a *certainty*.

customer but only to that information the Act requires to be 'disclosed' to a customer.").

In Plaintiffs' Memorandum in Support of their Motion for Judgment on the Pleadings, Plaintiffs last assert a violation of the TILA because "Defendants failed to disclose the actual interest rate on which the payments set forth in the schedule on the TILDS are based." (Pls.' Mem. in Supp. at 16.)  Plaintiffs present the following example: the disclosure statement provided to Plaintiff Mincey lists an annual percentage rate of 7.230%, and the payments for the first year of her loan are $456.12 per month. (*Id*. at 17.)  Plaintiffs assert that "[i]f this payment were an actual payment of principal and interest, it would represent a rate of approximately 1.25% and not the 7.230% listed on the TILDS." (*Id*.)  According to Plaintiffs, "Defendants violated 12 C.F.R. § 226.17(a)(1) and 12 C.F.R. § 226.19 in that they failed to disclose that the payment amounts listed in their Truth in Lending Disclosure Statements were not based upon the disclosed interest rate, but instead, were based upon an undisclosed, much lower interest rate, and were certain to result in negative amortization." (*Id*.)

While Plaintiffs seem to be asserting WSB was required to disclose the interest rate on the disclosure statement, WSB was actually required to disclose the annual percentage rate, which it did. *See* 12 C.F.R. § 226.18; *see also Andrews v. Chevy Chase Bank, FSB*, 240 F.R.D 612, 619-20 (E.D. Wis. 2007) (concluding the defendant violated the TILA by disclosing the loan's interest rate of 1.950 percent when that rate only applied to the first monthly payment). Plaintiffs have not argued the figure listed for the annual percentage rate is incorrect.  Because the TILA required WSB to disclose the annual percentage rate, and because WSB did so, the court concludes WSB's disclosures did not violate the TILA in this regard. *Cf. Smith v. Anderson*, 801 F.2d 661, 663 (4th Cir. 1986) ("'APR' likewise differs from the general definition

of interest rate because it considers, by definition, a broader range of finance charges when

determining the total cost of credit as a yearly rate."); *Enright v. Beneficial Fin. Co. of N.Y.*, 527

F. Supp. 1149, 1157 (N.D.N.Y. 1981) ("[T]he Annual Percentage Rate is not, under the TILA, a

true interest rate, but rather reflects the annual percentage rate of the Finance Charge which

includes items besides interest.").

   **b.**  **State Law Claims**

  In its Memorandum in Support of its Motion for Judgment on the Pleadings, WSB asserts

Plaintiffs' second, third, and fourth causes of action are preempted by the Home Owners' Loan

Act of 1933 ("HOLA").  (Def.'s Mem. in Supp. of Mot. for J. at 28.)  WSB states,

> Plaintiffs merely repackage their deficient TILA claims and allege that World's
> allegedly deficient disclosures amounted to fraudulent omissions, a breach of
> contract and a breach of the implied covenant of good faith and fair dealing, and
> violated the [SC]UTPA.  Not only do Plaintiffs' allegations of inadequate
> disclosures lack merit, . . . but these claims, which are all based on the content of
> World's loan disclosures, are preempted by the Home Owners' Loan Act of 1933
> (the "HOLA").

(*Id*.)  Plaintiffs, on the other hand, argue their claims are not preempted because the causes of

action at issue "are expressly excluded from preemption under the HOLA."  (Pls.' Mem. in

Supp. of Mot. for J. at 20.)

  Title 12, Code of Federal Regulations, section 560.2(a) states,

> Occupation of field.  Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. §
> 1463(a), 1464(a), OTS [(the Office of Thrift Supervision)] is authorized to
> promulgate regulations that preempt state laws affecting the operations of federal
> savings associations when deemed appropriate to facilitate the safe and sound
> operation of federal savings associations, to enable federal savings associations to
> conduct their operations in accordance with the best practices of thrift institutions
> in the United States, or to further other purposes of the HOLA.  To enhance safety
> and soundness and to enable federal savings associations to conduct their
> operations in accordance with best practices (by efficiently delivering low-cost
> credit to the public free from undue regulatory duplication and burden), OTS

hereby occupies the entire field of lending regulation for federal savings associations.  OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation.  Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part.  For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.

12 C.F.R. § 560.2(a).  The regulation lists, by way of example, some of the types of state laws preempted by § 560.2(a): requirements regarding (1) "the terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan"; (2) loan-related fees; and (3) "[d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents . . ."  12 C.F.R. § 560.2(b).  The regulation also indicates that certain state laws are not preempted:

> State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:
> (1) Contract and commercial law;
> (2) Real property law;
> (3) Homestead laws specified in 12 U.S.C. 1462a(f);
> (4) Tort law;
> (5) Criminal law; and
> (6) Any other law that OTS, upon review, finds:
> (i) Furthers a vital state interest; and
> (ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

12 C.F.R. § 560.2(c).

In addition to these rules, OTS outlined the proper analysis in evaluating whether a state

law is preempted under the regulation:

> When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. The presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

Lending and Investment, 61 Fed. Reg. 50951-01, 50966-67 (Sept. 30, 1996).

Two recent circuit court opinions shed some light on when a state law claim is preempted by HOLA. In *Silvas v. E\*Trade Mortgage Corp.*, 514 F.3d 1001 (9th Cir. 2008), the Ninth Circuit affirmed the district court's application of field preemption to bar the plaintiffs' claims. The plaintiffs sought to refinance their mortgage with the defendant and paid a $400 fee to lock in the interest rate during this process. *Silvas*, 514 F.3d at 1003. The plaintiffs rescinded, but the defendant refused to refund the $400 fee. *Id.* Nearly four years later, the plaintiffs brought suit alleging that the defendant violated California's Unfair Competition Law "by misrepresenting rescission rights under TILA and by failing to provide a refund of the deposit as required by TILA." *Id.* Although the state-law claims "were predicated exclusively on a violation of TILA, [the plaintiffs] did not assert a claim under TILA itself." *Id.*[9]

The defendant moved to dismiss on the ground that federal law preempted the state-law

---

[9]The first claim in *Silvas* alleged that E\*Trade violated California's Unfair Competition Law by representing to its customers that the $400 fee was non-refundable when it was in fact refundable if the customer exercises his right to rescind under the TILA. *Silvas*, 514 F.3d at 1003. The second claim alleged the defendant violated the state's unfair competition law in two ways: (1) the policy of refusing to refund the $400 fee was an unlawful business act, and (2) the practice of misrepresenting "consumers' legal rights in advertisements and other documents is unfair, deceptive, and contrary to the policy of California." *Id.*

claims, and the district court granted the motion.  *Id*.  The Ninth Circuit affirmed, concluding the

OTS regulation occupies the field.  *Id*. at 1005.  Of the first claim, the court stated,

> Here, [plaintiffs] allege that E*TRADE violated [California law] by including
> false information on its website and in every media advertisement to the
> California public.  Because this claim is entirely based on E*TRADE's
> *disclosures and advertising*, it falls within the specific type of law listed in §
> 560.2(b)(9).  Therefore, the preemption analysis ends. [The California law] as
> applied in this case is preempted by federal law.

*Id*. at 1006.  Turning to the plaintiffs' claims of unfair competition, the court concluded

plaintiffs' claim that E*TRADE's alleged practice of misrepresenting consumers' legal rights in

advertising and other documents violated California law was also preempted "because the

alleged misrepresentation is contained in advertising and disclosure documents."  *Id*.  The

second claim of unfair competition, alleging that the lock-in fee itself was unlawful, was also

preempted because "[s]ection 560.2(b)(5) specifically preempts state laws purporting to impose

requirements on loan related fees."  *Id*.

The plaintiffs' last argument on appeal was that both of their state law claims fit under §

560.2(c)(1) and (4) "because they are founded on California contract, commercial, and tort law,

merely enforcing the private right of action under TILA."  *Id*.  The court did not reach this

question, however, because the plaintiffs' claims "are based on types of laws listed in paragraph

(b) of § 560.2, specifically (b)(9) and (b)(5)."  *Id*. at 1006-07.

Judge Posner's analysis in *In re: Ocwen Loan Servicing, LLC Mortgage Servicing

Litigation*, 491 F.3d 638 (7th Cir. 2007), is slightly different.  The defendants in that case

appealed the district judge's refusal to dismiss, as preempted by HOLA, the plaintiffs' claims

under California, Connecticut, Illinois, New Mexico, and Pennsylvania law.  *Ocwen*, 491 F.3d at

641.  The defendant in *Ocwen* "ma[de] much of the fact that . . . [OTS] has said that in applying

the regulation a court should first decide whether the state law in question is listed in subsection

(b) [of § 560.2] and, if so, [the defendant] argues, that is the end of the case."  *Id*. at 643.  Judge

Posner responded,

> Well, of course.  And the OTS's statement further explains that subsection (c), the
> list of laws that are not preempted, is designed merely to preserve the traditional
> infrastructure of basic state laws that undergird commercial transactions, not to
> open the door to state regulation of lending by federal savings associations. . . .
> 	The line between subsections (b) and (c) is both intuitive and reasonably
> clear. [OTS] has exclusive authority to regulate the savings and loan industry in
> the sense of fixing fees (including penalties), setting licensing requirements,
> prescribing certain terms in mortgages, establishing requirements for disclosure of
> credit information to customers, and setting standards for processing and
> servicing mortgages.  But though it has some prosecutorial and adjudicatory
> powers ancillary to its regulatory functions, [OTS] has no power to adjudicate
> disputes between the S&Ls and their customers.  So it cannot provide a remedy to
> persons injured by wrongful acts of savings and loan associations, and
> furthermore HOLA creates no private right to sue to enforce the provisions of the
> statute or the OTS's regulations.
> 	Against this backdrop of limited remedial authority, we read subsection
> (c) to mean that OTS's assertion of plenary regulatory authority does not deprive
> persons harmed by the wrongful acts of savings and loan associations of their
> basic state common-law-type remedies.

*Id*. (internal quotation marks and citations omitted).  Judge Posner then provided two examples

of actions that would not be preempted: if a savings and loan association specified an annual

interest rate of six percent but then billed the homeowner at ten percent, "[i]t would be surprising

for a federal regulation to forbid the homeowner's state to give the homeowner a defense [to the

association's foreclosure action] based on the mortgagee's breach of contract."  *Id*. at 643-44.  In

addition, if a mortgagee fraudulently represents to a mortgagor that it will forgive a default, and

then forecloses, "it would be surprising for a federal regulation to bar a suit for fraud."  *Id*. at

644.

The Seventh Circuit ultimately affirmed the district court's denial of the motion to

dismiss, but part of its reasoning was that the Complaint simply was not clear enough to determine whether dismissal was warranted. *See id.* at 648-49. In reading Judge Posner's analysis of the plaintiffs' claims, it appears that a breach of contract claim is not preempted to the extent that it alleges a conventional breach of contract claim. *See Ocwen*, 491 F.3d 638. The claim pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act complains that the defendant "demands from the mortgagors payments of fees for an entire foreclosure case at its inception." *Id.* at 647. The court stated that if this demand "is forbidden by the loan contract, then the charge is not preempted; otherwise, it probably is." *Id.* Judge Posner also concluded that common law fraud is not likely preempted:

> The tenth claim is based on . . . another California statute, the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* The plaintiffs interpret the statute to forbid deceptive practices, such as falsely representing sponsorship or approval of Ocwen's services. If this is like common law fraud, then it probably is not preempted. But is it? One cannot tell from the complaint whether, for example, the charge is limited to deliberate deception or whether as interpreted by the plaintiffs the Act creates a code of truthful marketing that would constitute the regulation of advertising, which is one of the preempted categories listed in subsection (b).

*Id.* at 647. A claim for fraud under New Mexico's Unfair Trade Practices Act, New Mexico Stat. Ann. §§ 57-12-1 *et seq.*, charging a gross disparity between the value received by class members and the price paid was, according to Judge Posner, "clearly . . . preempted." *Ocwen*, 491 F.3d at 647.

Turning to the case *sub judice*, Plaintiffs listed their second cause of action as "fraudulent omissions." In assessing whether this claim is preempted, it is helpful to review several allegations pertaining to this cause of action:

> 109. As alleged herein, pursuant to TILA, 15 U.S.C. § 1601, et. seq., Regulation Z (12 C.F.R. § 226), and the Federal Reserve Board's Official Staff Commentary,

Defendants had a duty to disclose to Plaintiffs and Class Members (i) the actual interest rate on which the payment amounts listed in the Truth in Lending Disclosure Statement are based (12 C.F.R. § 226.17(c)); (ii) that making the payments according to the payment schedule listed in the Truth in Lending Disclosure Statement will result in negative amortization and that the principal balance will increase (12 C.F.R. § 226.19); and (iii) that the payment amounts listed on the Truth in Lending Disclosure Statement are insufficient to pay both the principal and interest.

110.  Defendants further had a duty to disclose to Plaintiffs (i) the actual interest rate being charge[d] on the Note; (ii) that negative amortization would occur and that the "principal balance will increase"; and (iii) that the initial interest rate on the Note was discounted, based upon Defendants' partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur.

111.  The Note states at ¶ 3 (A) "I will pay Principal and interest by making payments" either monthly or every two weeks, based on whether the loan was paid on a biweekly or monthly basis.  However, the true facts are that the payments listed by Defendants on the Truth in Lending Disclosure Statement are insufficient to pay both principal and interest.  In fact, the payment amounts listed on the Truth in Lending Disclosure Statement are insufficient to pay enough interest to avoid negative amortization which, under the terms of the Note was certain to occur if Plaintiffs made the payments according to the payment schedule listed in the Truth in Lending Disclosure Statement.

. . .

115.  As alleged herein, Defendants had a duty to disclose to Plaintiffs, and at all times relevant, failed to disclose and/or concealed material facts by making partial representations of some material facts when Defendants had exclusive knowledge of material facts, including but not limited to (i) the payment amounts listed in the Truth in Lending Disclosure Statement were not based on the actual interest rate charged on the Note; (ii) that negative amortization was certain to occur; and (iii) that the payment amounts listed in the Note and Truth in Lending Disclosure Statement are insufficient to pay both principal and interest. . . .

(Am. Compl. ¶¶ 109-115.)

Reading these allegations, it is clear that Plaintiffs' second cause of action is preempted.

The allegations concern what WSB should have *disclosed*, and 12 C.F.R. § 560.2(b)(9)

specifically indicates that state laws purporting to impose requirements regarding "[d]isclosure

and advertising" are preempted.  *See also Silvas*, 514 F.3d at 1006; *see also Reyes v. Downey Savs. & Loan Ass'n, F.A.*, 541 F. Supp. 2d 1108, 1115 (C.D. Cal. 2008) (concluding plaintiffs' claim for violation of California's unfair competition law was preempted because the state law claims were based on alleged violations of the TILA); *Kajitani v. Downey Savs. & Loan Ass'n, F.A.*, No. 07-00398 SOM/LEK, 2008 WL 2164660, at *11 (D. Haw. May 22, 2008) ("Paragraph 32, which concerns Downey's alleged promises regarding interest rates, charges, and the terms of financing, is not preempted if the Kajitanis are alleging that Downey orally misled them about those terms.  But if the Kajitanis are alleging that these terms were not properly disclosed in the disclosure documents required under TILA, then that matter is preempted as concerning 'disclosure and advertising,' which falls under 12 C.F.R. § 560.2(b).")  Furthermore, to the extent Plaintiffs seek to invoke § 560.2(c), the court concludes a state law that would impose certain disclosure requirements upon WSB does more than "incidentally affect . . . lending operations."  12 C.F.R. § 560.2(c).

Plaintiffs' third cause of action alleges a violation of the South Carolina Unfair Trade Practices Act.  For reasons substantially similar to those with respect to the second cause of action, the court concludes this claim is also preempted.  Plaintiffs allege, *inter alia*,

> 125.  At all times relevant, Defendants engaged in a pattern of deceptive conduct and concealment aimed at maximizing the number of borrowers who would accept their Option ARM loans.  Defendants sold to Plaintiffs and the Class Members a deceptively devised financial product.  Defendants sold their Option ARM loan product to consumers, including Plaintiffs and the Class Members, in a false or deceptive manner.  Defendants promised that the loan would have a very low, fixed payment, with only a small annual increase in the payment amount, for a period of up to ten (10) years; and that the payment amount would be based on the listed interest rate.  Defendants withheld from Plaintiffs and the Class Members the fact that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.

126.  Defendants lured Plaintiffs and the Class Members into the Option ARM loans with promises of low payments.  Once Plaintiffs and the Class Members entered into these loans, Defendants began taking away equity from Plaintiffs' homes.  And, Plaintiffs could not escape because Defendants purposefully placed into these loans an extremely onerous prepayment penalty that made it prohibitively expensive for consumers to extricate themselves from these loans.  Thus, once on the hook, consumers could not escape from Defendants' loans during this prepayment penalty period.

127.  Defendants sold their Option ARM loans as having a low payment.  However, Defendants failed to disclose, and by omission, failed to inform Plaintiffs that the low payments listed in the Note and Truth in Lending Disclosure Statement were insufficient to pay both principal and interest and were, in fact, at all times relevant, completely insufficient to pay all of the interest accruing on the loans.  Further, and in addition to Defendants' failure to disclose the actual costs of the loans, Defendants failed to disclose, and by omission, failed to inform Plaintiffs that there was a discrepancy between the interest rate upon which the payments were based that [sic?] the actual interest Defendants charged on the loans.

(Am. Compl. ¶¶ 125-27.)  Plaintiffs also allege that they were led "to believe that if they made payments according to Defendants' payment schedule, that the loans would only 'from time to time' result in negative amortization.  However, Defendants failed to disclose, and by omission, failed to inform Plaintiffs that if they made their payments according to Defendants' payment schedule, that by the 11th year of the loans, the Plaintiffs will have lost between 15-25% of the equity in their home . . . ."  (*Id.* ¶ 128.)  Plaintiffs further state that "Defendants' failures to disclose important material information concerning the actual cost of the loans is, and was, unfair, fraudulent, and deceptive."  (*Id.* ¶ 133.)

The alleged violation of the SCUTPA is in the failure to make certain disclosures concerning the loans at issue.  Again, 12 C.F.R. § 560.2(b) specifically states that state laws purporting to impose requirements regarding disclosures are preempted.

Plaintiffs' last cause of action is for breach of contract and the implied covenant of good

faith and fair dealing.  In reading the allegations contained under that cause of action, it appears

Plaintiffs are again complaining, at least in part, about the failure to make certain disclosures.

*See* Am. Compl. ¶ 158 ("The written payment schedules prepared and created by Defendants,

and applicable to Plaintiffs' loans, did not disclose, and by omission, failed to inform Plaintiffs

that the payment amounts owed by Plaintiffs to Defendants in years one through ten are

insufficient to cover the true costs of the loan.").  However, the court concludes that Plaintiffs'

fourth cause of action is not preempted.  As previously noted, the Note states that Plaintiffs "will

pay Principal and interest by making payments" monthly or every two weeks.  The substance of

the claim for breach of contract is that although the Note indicated that payments "will pay

Principal and interest," the payments did not in fact go to both principal and interest–the

payments for the first ten years went solely to interest.  Plaintiffs state,

> 157.  The Note and Truth in Lending Disclosure Statement expressly and
> impliedly agreed that if Plaintiffs made the monthly/biweekly payments in the
> amount prescribed by Defendants in the Truth in Lending Disclosure Statement,
> that negative amortization would not occur.  As alleged herein, the Note expressly
> states and/or implies that Plaintiffs' monthly/biweekly payment obligations will
> be applied to pay both principal and interest on the loan. . . .

(Am. Compl. ¶ 157.)

This cause of action is a straightforward breach of contract action: Plaintiffs allege the

contract said payments will be applied to interest and principal but that WSB breached that

contract by applying payments only to interest.  The court therefore concludes this cause of

action is not preempted.  *See Ocwen*, 491 F.3d at 643-44 (indicating that HOLA would not

preempt a breach of contract action in the case where a homeowner agreed to pay interest of six

percent but was billed interest at a rate of ten percent); *see also Reyes*, 541 F. Supp. 2d at 1114

("[A] law against breach of contract will not be preempted just because the contract relates to

loan activity.").

Having concluded Plaintiffs' fourth cause of action, breach of contract and the implied covenant of good faith and fair dealing, is not preempted, the court will now address WSB's remaining arguments for dismissal.  WSB argues this cause of action should be dismissed "because the documents [Plaintiffs] signed contradict their allegations that World failed to act in accordance with the terms of Plaintiffs' Notes."  (Def.'s Mem. in Supp. of Mot. for J. at 34.) WSB asserts that the documents attached to Plaintiffs' Amended Complaint "which Plaintiffs signed–demonstrate that all of World's alleged actions were permitted by Plaintiffs' loan documents."  (*Id*.)

In *Reyes*, the defendants made a similar argument, stating that the "express terms of the signed contract provide for the exact behavior" of the defendants.  *Reyes*, 541 F. Supp. 2d at 1116.  The court denied the motion to dismiss, stating,

> Plaintiffs demonstrate that the loan contract states, "I will pay Principal and interest by making a payment every month."  (Complaint 24:15-16.)  This could easily be understood to mean that, if Plaintiffs made payments every month, their payments would be applied to both principal and interest.  Plaintiffs have alleged that they were led to understand the contract in that way, and that Defendants breached that contract.  Thus, Plaintiffs have sufficiently alleged that the terms of the contract were ambiguous.

*Id*.; *see also Monaco v. Bear Stearns Residential Mortgage Corp.*, —F. Supp. 2d—, 2008 WL 867727, at *4-5 (C.D. Cal. 2008) (denying defendants' motion to dismiss plaintiffs' causes of action for breach of contract and breach of the implied warranty of good faith wherein the plaintiffs alleged the defendants breached the note by immediately raising the interest rate on plaintiffs' loans and by not applying plaintiffs' monthly payments to interest and principal). WSB points to another provision in the note indicating that "[f]rom time to time," the monthly or

biweekly payments "may be insufficient to pay the total amount" of interest due and that if that occurs, the amount of interest not paid will be added to the principal.  The differing provisions, however, do nothing to cure the ambiguity.  Based on the reasoning in *Reyes* and *Monaco*, the court denies WSB's motion to dismiss Plaintiffs' fourth cause of action.

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that the Motion to Dismiss filed by Defendants Golden West and Wachovia is **GRANTED** without prejudice.  It is further **ORDERED** that WSB's Motion for Judgment on the Pleadings is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, WSB's Motion for Judgment on the Pleadings is granted with respect to Plaintiffs' claims pursuant to the Truth in Lending Act except Plaintiffs' claim that WSB violated the TILA by disclosing that negative amortization was a possibility when in fact it was a certainty. The court also grants WSB's Motion for Judgment on the Pleadings with respect to Plaintiffs' claims for fraud and violation of the SCUTPA.  The court denies WSB's Motion for Judgment on the Pleadings with respect to Plaintiffs' claim for breach of contract and the implied covenant of good faith and fair dealing.  It is also **ORDERED** that Plaintiffs' Motion for Judgment on the Pleadings is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiffs' motion is granted to the extent Plaintiffs claim WSB violated the TILA by disclosing that negative amortization was a possibility when in fact it was a certainty.  Plaintiffs' motion is denied with respect to all other alleged violations of the TILA.

**AND IT IS SO ORDERED**.

_____
PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**August 15, 2008**